<u>AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR</u>
<u>CRIMINAL COMPLAINT AND SEARCH WARRANTS</u>

I, Brian C. Sweger, being duly sworn, depose and state as follows:

1.      I am a Special Agent with the United States Drug Enforcement Administration

("DEA"), and have been so employed for approximately nine years.  As such, I am an

investigative or law enforcement officer of the United States within the meaning of Title 18,

United States Code, Section 2510(7).

2.      Since May 2017, I have been assigned to the Tactical Diversion Squad ("TDS")

based in Worcester, Massachusetts.  The DEA-TDS is comprised of police officers from local

police departments, as well as special agents and diversion investigators from the DEA.  The

mission of the DEA-TDS is to investigate and prevent the diversion of controlled

pharmaceuticals and pre-cursor chemicals using the resources of the participating law

enforcement agencies.

3.      I have been involved in numerous drug investigations, including wiretap

investigations, where I have analyzed telephone toll records and subscriber information.  I have

also participated in both physical and electronic surveillances, including monitoring cell phone

"pings," the purchase of illegal drugs, enforcement operations including the execution of both

search and arrest warrants, and interviews of sources of information, confidential sources, drug

traffickers, and other members of drug trafficking organizations.

4.      Through prior investigations and training, I am familiar with the manner and

means commonly employed by drug traffickers and drug trafficking organizations to conduct

their illegal activities, including purchasing, manufacturing, storing, and distributing controlled

substances, the laundering of illegal proceeds, and the efforts of persons involved in such

activities to avoid detection by law enforcement.  I am also familiar with the terminology and

slang commonly employed by drug traffickers.  I have observed and examined cocaine, heroin, and fentanyl as well as other controlled substances.  I am aware of the street prices for these substances, the methods of packaging, and the jargon used in the drug trade.

5.      I have conducted or assisted in at least fifty narcotics investigations and participated in over one hundred debriefings of confidential informants and defendants.  I have testified in criminal trials, in both federal and state courts, as a result of my involvement in those investigations.  Throughout my career, I have made or participated in hundreds of arrests.  I have also applied for, been issued, and have executed search warrants in furtherance of narcotics investigations.

## PURPOSE OF AFFIDAVIT

6.      I submit this affidavit in support of applications for: (1) a criminal complaint charging Venlen Holbrook ("HOLBROOK"), born 1972, with distribution of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) (the "Subject Offense"); (2) a warrant authorizing the search of HOLBROOK's cellular phone assigned telephone number (508) 410-6743 (the "Subject Telephone"); and (3) a warrant authorizing the search of HOLBROOK's residence at 275 Pleasant Street, Apartment 217, Worcester, Massachusetts (the "Subject Property").

7.      As detailed below, there is probable cause to believe that HOLBROOK has committed the Subject Offense on multiple occasions between June 3, 2019 and August 14, 2019.

8.      As detailed below, there is also probable cause to believe that HOLBROOK has used the Subject Telephone to participate in and facilitate the Subject Offense.  As such, there is

probable cause to believe that the Subject Telephone contains evidence, fruits, and instrumentalities of the Subject Offense, as described in Exhibit A.

9.      As further detailed below, there is probable cause to believe that the Subject Property contains evidence of crimes, contraband, fruits of crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing crimes, namely, the Subject Offense.  A more detailed description of the Subject Property is attached hereto as Exhibit B.  A specific list of items to be searched for and seized from the Subject Property is attached hereto as Exhibit C.

10.     I am familiar with the facts contained in this affidavit from my own personal participation in this investigation and from oral and written reports made by other DEA agents and other federal, state, and local law enforcement agencies.

11.     This affidavit does not contain every fact known to me with respect to this investigation.  Rather, it contains only those facts that I believe are necessary to establish probable cause to believe that HOLBROOK committed the Subject Offense and probable cause for the issuance of requested warrants authorizing the search of the Subject Telephone and Subject Property.

## RELEVANT STATUTES

12.     Title 21, United States Code, Section 841(a)(1) makes it unlawful for any person, knowingly or intentionally, to manufacture, distribute, or dispense a controlled substance.

13.     Title 21, United States Code, Section 812 identifies fentanyl as a controlled substance.

EVIDENCE IN SUPPORT OF PROBABLE CAUSE OF THE SUBJECT
OFFENSE AND TO SEARCH THE SUBJECT TELEPHONE

A.    The Initial Investigation

14.    In May 2019, a confidential source ("CS") approached the DEA seeking to cooperate with law enforcement in exchange for payment.[1]  During an initial debriefing with agents,[2] the CS identified HOLBROOK as a long time drug source and stated that HOLBROOK sells heroin and cocaine for approximately $20,000 per week.  The CS further stated that HOLBROOK is a Hispanic male, of average build, and is in possession of at least two handguns, a black 9 mm handgun and a two-toned .45 caliber gun.

15.    Since May 2019, the CS has conducted six controlled buys from HOLBROOK on six different dates: June 3rd, June 11th, June 20th, July 8th, August 1st, and August 14th.  Each of those transactions was both video- and audio-recorded.

16.    In addition to the audio/video recordings, during many of the drug transactions, nearby agents conducted physical surveillance of HOLBROOK.  Based on the surveillance and

---

[1] The CS does have a criminal record, including several continuances without a finding ("CWOF") and one guilty file in Massachusetts state court.  In 2015, the CS received a CWOF for Larceny over $250.  In 2012, the CS received a guilty filed for defrauding an innkeeper, and multiple CWOFs for Uttering, Forgery, Larceny More, and Larceny Less.  To date, the CS has only provided one statement that proved to be inaccurate: i.e. the floor that HOLBROOK's sister resides on at 275 Pleasant Street.  Otherwise, the information provided by the CS has been accurate.  Further, with the exception of the August 1, 2019 controlled buy (as described below in paragraphs 45 to 51), I have reviewed the audio/video recording of each of the controlled buys and have found the substance of those recordings to be consistent with the CS's description of each transaction during the post-buy meetings.  For those reasons, I believe that the CS is a reliable source of information.

[2] The use of the term "agents" in this affidavit refers generally to special agents employed by the DEA, as well as task force officers assigned to DEA-TDS and other local law enforcement officers participating in this investigation.

his likeness in the videos, agents positively identified HOLBROOK, using his Registry of Motor

Vehicles picture, as the person selling drugs to the CS during the six drug transactions.

17.    Agents further conducted a criminal history check for HOLBROOK, which

revealed an open Worcester Superior Court case for: (1) distribution of heroin, 2nd or subsequent

offense; (2) distribution of a class E substance, 2nd or subsequent offense; (3) possession with

intent to distribute heroin, 2nd or subsequent offense; and (4) possession with intent to distribute

cocaine, 2nd or subsequent offense.  Furthermore, HOLBROOK was previously convicted in

June 2009 in Worcester Superior Court for: (1) assault with a dangerous weapon; (2) assault with

a dangerous weapon; (3) distribution of cocaine; (4) distribution of cocaine; and (5) possession

with intent to distribute cocaine.

B.    The June 3, 2019 Controlled Buy

18.    Prior to and on June 3, 2019, the CS called HOLBROOK at telephone number

(774) 502-1585 to purchase heroin.[3]  The CS and HOLBROOK arranged to meet at 43 June

Street, in Worcester, Massachusetts.

19.    Prior to the transaction, the CS told agents that s/he owed HOLBROOK

approximately $300 from a previous heroin sale.  Agents searched the CS and her/his vehicle for

contraband and excess currency, and finding none, provided $900 to the CS to pay off her/his

debt to HOLBROOK and purchase approximately $600 worth of heroin.

20.    At approximately 11:58 am, the CS picked up HOLBROOK in her/his vehicle at

43 June Street and gave the $900 to HOLBROOK.  However, because HOLBROOK only had

---

[3] The telephone calls were not recorded.

$250 worth of heroin in his mouth,[4] HOLBROOK stated that he needed to package more heroin at his house.  HOLBROOK returned $280 to the CS and gave the CS three baggies of an off-white powdery substance.

21.      The CS dropped off HOLBROOK at the Dunkin' Donuts at the intersection of Main and Front Street in Worcester.  HOLBROOK and the CS arranged to meet an hour later to complete the sale after HOLBROOK packaged more heroin.

22.      The CS then met agents at a predetermined location, where the CS gave the agents the $280 and the purported heroin.  The agents searched the CS and her/his vehicle for additional contraband with negative results.

23.      About one hour later, the CS reported that s/he had just communicated with HOLBROOK, who was ready to sell more heroin.  The agents again searched the CS and her/his vehicle for contraband and excess currency, and finding none, provided the $280 to the CS.

24.      At approximately 1:42 pm, HOLBROOK again entered the CS's vehicle near 43 June Street.  After the CS provided the $280 to HOLBROOK, HOLBROOK removed a small baggie of suspected heroin from his mouth and handed it to the CS.  HOLBROOK then exited the vehicle at a gas station.  The CS drove to meet with agents at predetermined location where s/he provided the purported heroin to the agents.  The agents searched the CS and her/his vehicle for additional contraband with negative results.

---

[4] During several of the transactions, HOLBROOK kept the packaged drugs in his mouth.  After the CS would give HOLBROOK the money, HOLBROOK would spit out the drugs and provide them to the CS. In my training and experience, drug dealers often carry the drugs in their mouth so that they can quickly swallow the drugs if stopped by law enforcement.

6

25.     Agents sent the suspected heroin that HOLBROOK sold to the CS on June 3, 2019 to the DEA Northeast Laboratory for testing.  That testing identified the presence of fentanyl.

C.      The June 11, 2019 Controlled Buy

26.     Prior to and on June 11, 2019, the CS contacted HOLBROOK at telephone number (774) 253-6237 to purchase heroin.[5][6]  Prior to the transaction, agents met with the CS and searched the CS and her/his vehicle for contraband and excess currency.  Finding none, agents provided $900 to the CS to purchase heroin from HOLBROOK.

27.     After meeting with agents, the CS drove to 533 Lincoln Street in Worcester to meet HOLBROOK at the Lowe's Store at approximately 1:30 pm.  While in the parking lot, the CS saw HOLBROOK, who was on the phone and wearing a dark t-shirt and red hat.  The CS followed HOLBROOK into the store, where the CS and HOLBROOK met a woman with blue hair.  The CS, HOLBROOK, and the woman exited the store and entered a silver vehicle.[7]

28.     Once in the car, the CS requested $600 worth of heroin.  HOLBROOK began to remove a substance from a clear, plastic baggie and informed the CS that he only had $500 worth of heroin.  The CS handed $500 to HOLBROOK.  HOLBROOK handed the CS a small twisted baggie containing an off-white powdery substance.  The CS then exited the vehicle, returned to her/his vehicle, and drove to meet agents at a predetermined location, where s/he provided the

---

[5] The telephone calls were not recorded.

[6] Before the telephone calls, HOLBROOK messaged the CS from the new phone number.  According to the CS, HOLBROOK changes his phone number every so often.

[7] The vehicle is registered to a women believed to be a relative of the woman with blue hair.

purported heroin and the remaining $400 to the agents.  The agents searched the CS and her/his

vehicle for any additional contraband with negative results.

29.     Agents subsequently sent the suspected heroin that HOLBROOK sold to the CS

on June 11, 2019 to the DEA Northeast Laboratory for testing.  That testing identified the

presence of fentanyl.

D.     The June 20, 2019 Controlled Buy

30.     On June 20, 2019, the CS contacted HOLBROOK at telephone number (774)

253-6237 to purchase heroin.  HOLBROOK told the CS to meet HOLBROOK's sister on

Congress Street.

31.     Prior to the transaction, agents searched the CS and her/his vehicle for contraband

and excess currency, and finding none, provided to the CS $500 to purchase heroin from

HOLBROOK.

32.     The CS then drove to the area of Congress Street and Newbury Street.  At

approximately 12:26 pm, agents observed HOLBROOK arrive at Congress Street.

33.     After HOLBROOK entered the CS's vehicle, the CS handed HOLBROOK the

$500.  HOLBROOK then removed the purported heroin from his mouth and provided it to the

CS.  HOLBROOK then provided a cellophane packet to the CS and the CS placed the drugs into

the packet.  HOLBROOK then exited the vehicle.

34.     The CS drove to a predetermined location, whereupon s/he provided the purported

heroin to the agents.  The agents searched the CS and her/his vehicle for any additional

contraband, which yielded negative results.

35.     Agents subsequently sent the suspected heroin that HOLBROOK sold to the CS on June 20, 2019 to the DEA Northeast Laboratory for testing.  To date, agents have not received the results from the laboratory.[8]

E.     The July 8, 2019 Controlled Buy

36.     Prior to and on July 8, 2019, the CS contacted HOLBROOK at telephone number (774) 253-6237 to purchase heroin from him.[9]  Although HOLBROOK initially told CS to meet him at 211 Chandler Street, HOLBROOK changed the location changed to 33 King Street, and later to 10 King Street in Worcester.

37.     Prior to the transaction, agents searched the CS and her/his vehicle for contraband and excess currency, and finding none, provided $1,000 to the CS to purchase heroin from HOLBROOK.

38.     The CS then drove to the area of 10 King Street.  At approximately 2:45 pm, agents observed HOLBROOK approach and enter CS's vehicle.

39.     During the subsequent car ride, the CS requested $800 worth of heroin from HOLBROOK.  HOLBROOK stated that he did not enough on his person and that he would need to go back to his house to get more heroin.  The CS then drove HOLBROOK to Sever Street, which is adjacent to 275 Pleasant Street.  Prior to HOLBROOK exiting the vehicle, the CS gave him $500.

---

[8] Per DEA policy, the agents did not field-test the substance based upon the danger posed by fentanyl.

[9] The telephone calls were not recorded.

9

40.     Agents observed HOLBROOK exit the vehicle and enter 275 Pleasant Street. Approximately 10-11 minutes later, agents observed HOLBROOK exit 275 Pleasant Street and re-enter the CS's vehicle.

41.     The CS provided $300 to HOLBROOK, who handed an additional quantity of purported heroin to the CS.  HOLBROOK exited the vehicle at the area of Pleasant Street and Park Street.

42.     The CS then drove to a predetermined location where s/he gave the remaining $200 and purported heroin to the agents.  The agents searched the CS and her/his vehicle for additional contraband with negative results.

43.     Later that day, HOLBROOK texted the CS to inform the CS that he had changed his phone number to (508) 410-6743.

44.     Agents subsequently sent the suspected heroin that HOLBROOK sold to the CS on July 8, 2019 to the DEA Northeast Laboratory for testing.  To date, agents have not received the results from the laboratory.

F.     The August 1, 2019 Controlled Buy

45.     Prior to the August 1st buy, the CS texted HOLBROOK at telephone number (508) 410-6743.  During the exchange, HOLBROOK asked the CS who s/he was and the CS informed him that s/he was texting him from her/his work phone.  HOLBROOK then instructed the CS to delete his phone number and the text messages from the CS's other phone and instructed the CS to call him.[10]  The two agreed to meet at Congress Street in Worcester to make the sale.

---

[10] The call between HOLBROOK and the CS was recorded.

46.     At 12:20 pm, the CS texted HOLBROOK "I have 800," and at 12:38 pm, that s/he was "5 min away."

47.     Prior to the transaction, agents searched the CS and her/his vehicle for contraband and excess currency.  Finding none, agents provided $800 to the CS to purchase heroin from HOLBROOK.

48.     The CS then drove to Congress Street and parked on the side of the road to wait for HOLBROOK.  A short time later, HOLBROOK arrived as a passenger in a white sedan.

49.     HOLBROOK was wearing an orange hat, which he hung out of the window, with the purported heroin in the hat.  The CS took the drugs in exchange for the $800.  Neither HOLBROOK nor the CS left their respective vehicles.[11]

50.     The CS then drove to a predetermined location, where s/he briefed agents on the sale and provided the purported heroin to the agents.  The agents searched the CS and her/his vehicle for any additional contraband, which yielded negative results.

51.     Agents subsequently sent the suspected heroin that HOLBROOK sold to the CS on August 1, 2019 to the DEA Northeast Laboratory for testing.  That testing identified the presence of fentanyl.

G.     The August 14, 2019 Controlled Buy

52.     Before the August 14th buy, the CS texted HOLBROOK at telephone number (508) 410-6743 to purchase heroin.  The two arranged to meet on Congress Street.

---

[11] Although this buy was audio and video recorded, HOLBROOK is neither seen nor heard on the video because HOLBROOK did not enter the CS's vehicle during the transaction.  Furthermore, none of the agents witnessed the transaction.  The description contained herein is based on the CS's later account of what happened while being debriefed by agents.

53.     Prior to the transaction, agents searched the CS and her/his vehicle for contraband and excess currency.  Finding none, agents provided $1,000 to the CS to purchase heroin from HOLBROOK.

54.     The CS then drove to Congress Street and parked on the side of the road to wait for HOLBROOK.  At approximately 2:10 pm, HOLBROOK was observed on the CS's video transmitter approaching the CS's vehicle.  HOLBROOK was wearing a red shirt and carrying a hat.[12]

55.     The CS began to drive.  At some point, the CS gave the $1,000 to HOLBROOK.  As the vehicle approached the interaction of Main Street and Franklin Street, HOLBROOK placed his hands near his front waistband.  Although the CS did not specifically see where HOLBROOK retrieved the baggie containing the purported heroin, shortly after, HOLBROOK handed the baggie to the CS.

56.     HOLBROOK exited the CS's vehicle in front of Worcester City Hall and walked away.

57.     The CS then drove to a predetermined location, where s/he briefed agents on the sale and provided the purported heroin to the agents.  The agents searched the CS and her/his vehicle for any additional contraband, which yielded negative results.

58.     While processing the baggie of purported heroin, agents determined that the amount of drugs in the baggie was less than expected for the purchase price of $1,000.  Agents

---

[12] In addition to the CS's observation that HOLBROOK was wearing a red shirt, HOLBROOK can be seen on air wing footage wearing a red shirt.  The air wing followed the CS's vehicle during the entire drug transaction.  The footage ended when HOLBROOK exited the CS's vehicle in downtown Worcester near City Hall.

instructed the CS to text HOLBROOK at telephone number (508) 410-6743 and complain about being shorted approximately three grams.  HOLBROOK texted back and stated that he would make it up to the CS next time.

59.     Agents subsequently sent the suspected heroin that HOLBROOK sold to the CS on August 14, 2019 to the DEA Northeast Laboratory for testing.  To date, agents have not received the results from the laboratory.

H.     <u>Basis for Search and Seizure of the Subject Telephone</u>

60.     In my training and experience, individuals involved in the illegal distribution of controlled substances will regularly use cellular phones to either contact sources of supply through phone calls, texts or emails to coordinate the acquisition of controlled substances or to contact buyers of controlled substances to arrange for the sales.  This request to seize and search includes "smartphones," i.e. those cell phones that are capable of serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.[13]

61.     As noted above, HOLBROOK regularly used his cell phone to participate in and facilitate the Subject Offense.  Prior to each of the six controlled buys, the CS always called or texted HOLBROOK in order to coordinate the time and location of each buy.

62.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files stored on cellular phones (and particularly smartphones) can be recovered months or years after they have been written,

---

[13] From the messages exchanged between the CS and HOLBROOK on August 14, 2019, it appears that HOLBROOK's phone is an iPhone.  The messages are blue, indicating that the texts are being sent through Apple's iMessage technology.  The blue messages can only be sent between two iPhones.

downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

a.       Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their cell phones, they can easily transfer the data from their old cell phone to their new phone.

b.       Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a smart phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.       Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

63.       Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in a cell phones, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that the cell phone be seized and processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because:

a.       Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.       Technical requirements for analyzing cell phones is a highly technical process requiring expertise and a properly controlled environment.  It is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.  This application seeks permission to search and seize cell phones either onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

14

EVIDENCE IN SUPPORT OF PROBABLE CAUSE
TO SEARCH THE SUBJECT PROPERTY

64.      In addition to the statements described in paragraph 14, during the initial

debriefing, the CS further told agents that HOLBROOK lived with his sister at 275 Pleasant

Street, third floor, in Worcester, Massachusetts.  The CS identified HOLBROOK's sister by

name and stated that s/he has previously communicated with HOLBROOK's sister over

Facebook Messenger.

65.      Subsequent to the conversation, agents also conducted a criminal history check

for HOLBROOK's sister.  HOLBROOK's sister does not have a criminal record.

66.      HOLBROOK's sister resides in Apartment 217 at 275 Pleasant Street.  According

to her lease, of which agents were able to obtain a copy, HOLBROOK's sister has resided in

Apartment 217 since 2015 and is the sole resident of her household.  Apartment 217 is a one-

bedroom apartment.

67.      HOLBROOK does not appear to have a lease at 275 Pleasant Street.[14]

68.      As stated above, from June to mid-August 2019, the CS conducted six controlled

buys from HOLBROOK.  During one of the buys, on July 8th, after the CS requested $800 worth

of heroin from HOLBROOK, HOLBROOK stated that he did not enough drugs on his person

and that he would need to go back to his house to get more heroin.[15]

_____

[14] HOLBROOK's name is not listed on the list of residents and apartment numbers that is taped to the
wall in the vestibule of the Sever Street entrance to 275 Pleasant Street.

[15] It should be noted that during the June 3rd buy, HOLBROOK also did not have enough drugs on his
person and told the CS that he needed to return home to retrieve more drugs.  However, HOLBROOK did
not return to 275 Pleasant Street; instead, he went to 10 Berman Street, where agents believe his girlfriend
resides.  In that same recording, HOLBROOK also informed the CS that he had moved the night before.

15

69.     The CS then drove HOLBROOK to Sever Street, which is adjacent to 275 Pleasant Street, and HOLBROOK exited the vehicle.

70.     At that time, agents observed HOLBROOK wearing an orange t-shirt, orange baseball hat, and light colored shorts.  Agents, conducting surveillance nearby, observed HOLBROOK exit the CS's vehicle and enter 275 Pleasant Street.

71.     Review of the security video at 275 Pleasant Street revealed that at approximately 2:52 pm, HOLBROOK walked through 275 Pleasant Street's courtyard and entered the rear door of the apartment building.  At approximately 2:53 pm, HOLBROOK entered the elevator lobby, entered the elevator, and at approximately 2:54 pm, HOLBROOK arrived on the second floor. HOLBROOK then proceeded to walk the entire length of the hallway.  Once at the end of the hallway, from the vantage point of the security camera, HOLBROOK made a right turn.

72.     At approximately 3:02 pm, HOLBROOK's orange t-shirt is observed on the right bottom corner of the camera.  At approximately 3:03 pm, agents observed HOLBROOK exit the front door of 275 Pleasant Street and enter the CS's vehicle, still parked at Sever Street.

A.     The Subsequent Investigation

73.     On August 18, 2019, I personally inspected the layout of 275 Pleasant Street.  The building, known as "Pleasant Tower," is divided into three wings:

---

However, based on further surveillance as described throughout this affidavit, it appears that HOLBROOK only lives in the Subject Property.



74.     There is a west, north, and east wing to the building.  Apartment 217 is in the west wing of the building.

75.     The video footage of HOLBROOK from July 8th is from the second floor of the west wing of Pleasant Tower.  There are six apartments on the second floor of the west wing: apartments 213, 214, 215, 216, 217, and 218.  Apartments 213, 215, and 217 are to the right of the hallway.  Apartments 214, 216, and 218 are to the left of the hallway.

76.     On August 18th, I specifically inspected the third floor of the west wing. Following my inspection of the third floor, I briefly went down to the second floor to confirm that the layout of the two floors are identical.[16]  Both floors contain a long and narrow hallway with three apartments on either side.  At the far end of both hallways is a door leading to the stairwell.  Above the stairwell door is the surveillance camera.  If one were to stand in front of

_____

[16] I inspected the third floor to avoid encountering HOLBROOK in the hallway on the second floor.  My inspection of third floor is recorded.

the stairwell door (in the same position as the surveillance camera), the only apartment immediately to the right of the stairwell door is apartment 317.  Likewise, on the second floor, the only apartment immediately to the right is apartment 217.

77.     Furthermore, I observed that the apartment adjacent to apartment 317 is apartment 315.  I further observed that the entrance to apartment 315 is approximately 15 to 20 feet away from the entrance to apartment 317.  The entrance to apartment 315 is in the middle of the hallway.  Likewise, on the second floor, the entrance to apartment 215 is approximately fifteen to twenty feet away from the entrance to apartment 217.  In reviewing video footage from the second floor, I observed people entering and exiting apartment 215.  On July 8th, I believe that HOLBROOK walked past apartment 215 to access the only apartment that is out of view and to the right of the surveillance camera.

78.     Based on my inspection of the second and third floors of the west wing of 275 Pleasant Street, I believe that the only apartment HOLBROOK could have entered on July 8, 2019 is apartment 217, the apartment leased to his sister.

79.     Furthermore, based on my inspection of the second and third floors of 275 Pleasant Street, I believe that after exiting apartment 217, HOLBROOK took the stairs down to the first floor of the building.  HOLBROOK's shirt is seen on the security camera on the second floor at 3:02 pm and at 3:03 pm, agents observed HOLBROOK exit the front door of 275 Pleasant Street and enter the CS's vehicle.

80.     I further reviewed the elevator lobby video footage and confirmed that HOLBROOK did not use the elevator prior to exiting the building at 3:03 pm.

81.     Subsequent to the July 8, 2019 drug transaction, I observed additional video footage of HOLBROOK entering or exiting the Subject Property.

18

82.     For example, I observed HOLBROOK either enter or exit the Subject Property on the following dates and time: on July 16, 2019 at approximately 4:53 pm, on July 18, 2019 at approximately 6:11 pm, on July 20, 2019 at approximately 12:19 pm,[17] approximately 6:54 pm, and approximately 9:12 pm, and on July 21, 2019 at approximately 6:13 pm.

83.     I then reviewed the video footage for August 1, 2019, the date of the next drug transaction.  On that date, I observed HOLBROOK on the camera wearing a red/orange t-shirt and hat, similar to the hat HOLBROOK wore during the controlled buy on that date.

84.     At approximately 12:24 pm, I observed someone wearing an orange/red t-shirt (the face was obstructed) exit apartment 217.[18]  HOLBROOK met the CS that day at approximately 12:48 pm.

85.     On August 1, 2019, at approximately 7:18 pm, I observed HOLBROOK on the security camera footage wearing the same shirt and hat with two unknown males.  At approximately 12:05 am on August 2, 2019, HOLBROOK is again seen on the security video in the same shirt and hat exiting the Subject Property towards the stairs.

CONCLUSION

86.     Based upon the foregoing, there is probable cause to believe that Venlen HOLBROOK did knowingly and intentionally distribute fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).

---

[17] HOLBROOK entered the Subject Property at approximately 12:19 pm with unknown blonde female who I believe to be his girlfriend.  I previously observed this woman on June 3rd with HOLBROOK.  I believe this female resides at 10 Berman Street.

[18] According to the CS, at the time the CS met with HOLBROOK, HOLBROOK's t-shirt was white.

87.     I further submit that probable cause exists to believe that the Subject Telephone contains fruits, evidence, and instrumentalities of the Subject Offense, as described in Exhibit A.

88.     I further submit that probable cause exists to believe that evidence, fruits and instrumentalities of the Subject Offense, as described in Exhibit C, will be found at the Subject Property.  Specifically:

     a.     On at least two occasions, HOLBROOK was observed exiting the Subject Property before meeting with the CS for a buy.  During the July 8th buy, HOLBROOK informed the CS that he needed to go home and retrieve more drugs to sell to the CS. Based on agent surveillance and the security camera footage of 275 Pleasant Street, HOLBROOK only entered and exited the Subject Property before returning to the CS with purported heroin.  On August 1st, about 24 minutes before the buy, HOLBROOK exited the Subject Property.

89.     As a result, there is probable cause to believe that controlled substances (such as fentanyl), paraphernalia for processing, diluting, weighing, and packaging controlled substances for sale, as well as books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances (as more fully described in Exhibit C) will be found within the Subject Property.

ACCORDINGLY, I respectfully request that the Court:

1)     Issue the requested criminal complaint and arrest warrant;

2)     Issue a warrant authorizing investigators to search HOLBROOK's cellular phone with the phone number (508) 410-6743, for the items described in Exhibit A; and

3)     Issue a warrant authorizing investigators to search 275 Pleasant Street, Apartment 217, Worcester, Massachusetts (described in more detail in Exhibit B), for the items described in Exhibit C.

I declare that the foregoing is true and correct.

_____

Brian C. Sweger
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me,
this 27th day of August, 2019.

Honorable David H. Hennessy
United States Magistrate Judge
District of Massachusetts

EXHIBIT A

**Items to Be Seized**

1.    All records, in whatever form, and tangible objects that constitute evidence, fruits, or
instrumentalities of 21 U.S.C. § 841(a)(1) (distribution of fentanyl), including those
related to:

      a)    Records of drug trafficking activities;

      b)    lists of customers and related identifying information;

      c)    any information recording schedule, whereabouts, or travel, including
calendar, e-mails, cell tower, and GPS data;

      d)    all bank records, checks, credit card bills, account information, and other
financial records;

      e)    the identity, location, and travel of any co-conspirators, as well as any co-
conspirators' acts taken in furtherance of the crimes listed above;

      f)    text messages and instant messages.

2.    Evidence of user attribution showing who used or owned Subject Telephone at the time the
things described in this warrant were created, edited, or deleted, such as logs, phonebooks,
saved usernames and passwords, documents, and browsing history;

3.    Records evidencing the use of the Internet in relation to the distribution of controlled
substances, including:

      a)    records of Internet Protocol addresses used;

      b)    records of Internet activity , including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages, search terms
that the user entered into any Internet search engine, and records of user-
typed web addresses.

      c)    As used above, the terms "records" and "information" include all of the
foregoing items of evidence in whatever form and by whatever means they
may have been created or stored, including any form of computer or
electronic storage (such as flash memory or other media that can store
data) and any photographic form.

**Definitions**

For the purpose of this warrant:

A.    "Equipment" means any hardware, software, storage media, and data.

B.    "Hardware" means any electronic device capable of data processing (such as a
computer, digital camera, cellular telephone or smartphone, wireless
communication device, or GPS navigation device); any peripheral input/output

device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C.     "Software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.     "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

E.     "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F.     "A record" is any communication, representation, information or data.  A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

### Return of Seized Equipment

If, after inspecting seized equipment, the government determines that the equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity and accuracy (but not necessarily relevance or admissibility) for evidentiary purposes.

If equipment cannot be returned, agents will make available to the equipment's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, personally-identifying information of victims; or the fruits or instrumentalities of crime.

EXHIBIT B

Apartment 217 is situated on the second floor of the west wing of 275 Pleasant Street, Worcester, Massachusetts.  The building is known as "Pleasant Tower."  The number "217" is affixed to the entry door of apartment 217 above the doorbell.  The door also includes a "WELCOME" sign.

Front of 275 Pleasant Street:

 

An aerial view of 275 Pleasant Street:            Entry to apartment 217:

 

24

EXHIBIT C

All records, in whatever form, and tangible objects that constitute evidence of a crime and constitute property designed for use, intended for use, or used in committing a crime, specifically, distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1), as set forth below:

1) Controlled substances, including fentanyl;

2) Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, for example: sealable plastic bags, manila envelopes, sandwich bags, heat sealers, and Ziploc bags;

3) Cellular Telephones belonging to or used by HOLBROOK;

4) Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5) Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6) Cash, currency, and records relating to proceeds derived from the sale of controlled substances and expenditures of money and wealth, to-wit: money orders, wire transfers, cashier's checks and receipts, keys and records relating to safe deposit boxes or storage units, bank accounts and statements, passbooks, checkbooks, and check registers, as well as precious metals and gems such as gold, silver, diamonds, etc., that are either: (a) identified by HOLBROOK as belonging to him; or (b) located and seized within an area of the residence determined to be primarily used or occupied by HOLBROOK; and

7) Financial instruments, precious metals, jewelry, and other items of value, proceeds of drugs transactions, records and documents of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking, that are either: (a) identified by HOLBROOK as belonging to him; or (b) located and seized within an area of the residence determined to be primarily used or occupied by HOLBROOK.